### POWERS et al. v. McLEAN.

(Supreme Court, Appellate Division, First Department. February 5, 1897.)

PRINCIPAL AND AGENT—LIABILITY OF AGENT OF UNDISCLOSED PRINCIPAL.

　　Where plaintiff ordered goods through an agent without knowing with whom the order would be placed, and a bill was received from defendant for the goods, and a check sent him in payment, defendant is liable as principal to supply the goods ordered, though he was merely acting as the agent of the manufacturer of the goods, in billing and collecting on a commission for their output and that of others in a combination or trust. Rumsey and Patterson, JJ., dissenting.

Appeal from judgment on report of referee.

Action by Millard F. Powers and others against Andrew McLean for breach of contract. There was a judgment dismissing the complaint, and plaintiffs appeal. Reversed.

　The plaintiffs ordered 50 bales of mosquito netting through one Loisson, in October, 1895. Their letter to Loisson reads as follows:

　　　　　　　　　　　　　　　　"Cleveland, Ohio, Oct. 29, 1895.

　"L. C. Loisson, Great Northern Hotel, Chicago, Ill.—Dear Sir: Kindly book us for 7/4 Adams mosquito netting bar, as follows (prices and terms to be in ac-

cordance with your letter of recent date): 20 bales white; 12 bales green; 6 black; 3 blue; 5 pink; 3 plain ·cardinal; 1 brown,—and oblige,

"Very truly, yours,                               Wm. Taylor, Son & Co.,
                                                        "Per Harvey."

After sending this letter, they received a bill for the goods, which reads as follows:

                                         "New York, Nov. 1, 1895.

"Wm. Taylor, Son & Co., Cleveland, O., to Andrew McLean, Dr., Sole Agent for Mosquito Netting Manufactured by R. & H. Adams, Andrew McLean & Co., James Thompson & Co., 46, 48 & 50 Wooster Street.

"Terms, 6/10 or 5/30, as April 1st, '96.

"Terms: ———.

"Rate for anticipation at 2% per month. 5036. 25.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2789/2808 | 5600 | pcs. | 20 | bales | 7/4 | white | 32.2 | 1820 |
| 2809/2820 | 3360 | " | 12 | " | | green | 35 | 1176 |
| 2821/2826 | 1680 | " | 6 | " | | black | 35 | 588 |
| 2827/2829 | 840 | " | 3 | " | | blue | 35 | 294 |
| 2830/2834 | 1400 | " | 5 | " | | pink | 37.2 | 525 |
| 2835/2837 | 840 | " | 3 | " | 1/4 pl | cardl | 37.2 | 315 |
| 2838 | 280 | " | 1 | " | | brown | 35 | 98 |

                                                              4816
                                                  10%          481 60

                                                              4334 40"

Stamped across the face:

"These goods shipped by R. & H. Adams. All orders to be sent direct to 16 Greene St., New York. Paid Nov. 11, 1895.

   "Terms:

"Dep't  Date:  O. K.  M. R. S.
        "Dep't:            Delivered by R. & H. Adams.
  "Ex'd, W. D. S.     Price O. K.  M. R. S.
  "Ent'd, H. E. W.   Chk'd, P. W. H.
  "Arrived, ———."

The plaintiffs thereupon sent to the defendant, in payment, a check made out to his order, which was indorsed and deposited to the credit of his firm. The plaintiffs thereafter received a telegram, signed by the defendant, which reads as follows:

"To W. Taylor, Son & Co. Owing to deduction sixteen per cent. instead of ten and six, your check is twenty-six dollars short. Shall we return check?
                                                             "Andrew McLean."

Thereupon they remitted another check to the defendant for the balance of $26, which was deposited in the same manner. It appeared that Loisson was a traveling salesman in the employ of R. & H. Adams, having no authority to sell the goods of the defendant or his firm; that he transmitted the order to R. & H. Adams; that R. & H. Adams received and accepted the order; that the defendant never sold the goods of R. & H. Adams or James Thompson & Co., but only those of his own firm, Andrew McLean & Co.; that the other two firms themselves made out and sent the bills for their own goods which were sold (in the defendant's name, however), and sent duplicates to the defendant; that the bill in this case was, in accordance with this course of business, made out and sent by R. & H. Adams; that the defendant collected the money for such bills, and paid over the same, deducting a commission of 2 per cent., to the firms owning and delivering the goods; and that he did so here, remitting to R. & H. Adams 98 per cent. of the amounts collected from the plaintiffs. It also appeared that Loisson never told the plaintiffs where he had booked their order, nor did R. & H. Adams tell them that they had accepted Loisson's order. The plaintiffs knew nothing whatever as to what Loisson had done, except the notice conveyed by the receipt of McLean's bill. It also appeared that the plaintiffs had had similar dealings upon prior occasions, and that upon such dealings they had received and

paid similar bills. It also appeared that McLean had previously notified them as to the price of mosquito netting. A postal card was put in evidence, which reads as follows:

"New York, May 21st, 1895.

"Owing to the scarcity and large demand, mosquito nettings have advanced in price 2½ cents a piece.  Andrew McLean, Agent."

Addressed on face of postal card: "W. Taylor, Son & Co., Cleveland, Ohio."

The plaintiffs claim that McLean is directly liable to them as principal. He claims that he is not liable, for the reason that the plaintiffs dealt directly with R. & H. Adams, and that he was merely an agent to collect the bill. The goods were never delivered to the plaintiffs. Other facts are stated in the opinion.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and PATTERSON, JJ.

Robert L. Harrison and Alfred H. Byrd, for appellants.
John E. Parsons, for respondent.

BARRETT, J. The question here of the defendant's liability is not a question of fact, pure and simple; it is rather a question as to the legal conclusion which should follow the inferences properly deducible from certain undisputed facts. It is quite true that the plaintiffs made no direct personal contract with the defendant for the purchase of the goods in question. They never, in fact, saw the defendant upon the subject of the sale. But it is equally true that they made no direct, personal contract with R. & H. Adams. They never saw any member of that firm upon this same subject. What is certain, however, is that they paid their money to the defendant for the goods in question. They paid it to him as the apparent principal in the transaction, not as the apparent agent for any one. Did he, in return for that money, correspondingly agree, by fair implication, to deliver the goods to the plaintiffs? That is the real question. The defendant admits that he received the money, but denies the corresponding agreement. He asserts, on the contrary, that it was not he, but the firm of R. & H. Adams, who agreed to deliver the goods. Undoubtedly, the firm of R. & H. Adams did so agree; that is, they so agreed with Loisson, who was acting under the plaintiffs' instructions. But did the defendant as well so agree? If he did, the possible liability of R. & H. Adams as undisclosed principals cannot save him. The principal and the agent may both be liable; so may the principal and even a collateral contractor. The purchaser may hold the agent for failure to disclose his principal, or he may hold the principal when disclosed; or he may, in either event, hold the collateral contractor, if the latter has made a distinct independent contract. Here it will be observed that the plaintiffs had no other knowledge of the real principal save that conveyed by the bill rendered. The only person whom they knew in the transaction prior to the receipt of this bill was Loisson. They had simply asked Loisson to "book" the goods for them. Loisson was an employé of R. & H. Adams, and he booked the goods with that firm. But of this latter fact the plaintiffs were not aware. They knew, however, that Loisson had formerly been in the employ of R. & H.

Adams; but, after the year 1893, they always supposed that he had become a salesman for what Mr. Swift describes as a "trust" or "combination," composed of three firms, viz. R. & H. Adams, Andrew McLean & Co., and James Thompson & Co. Mr. Swift testified that he did not think his firm (the plaintiffs) bought any mosquito netting through Loisson after the year 1893, "except through the combination." Be that as it may, Loisson was authorized to book the goods wherever he deemed best. He never notified the plaintiffs that he had booked the goods with R. & H. Adams, nor did that firm ever come forward as principals in the matter, or notify the plaintiffs that they had contracted with Loisson. On the contrary, they sent the plaintiffs a bill which plainly disavowed their own principalship, and notified the plaintiffs of the defendant's principalship. All the plaintiffs knew, from the beginning to the end, was that they had authorized Loisson, acting as a salesman for the trust or combination, to book the goods wherever he pleased, and that, as a direct and immediate consequence, the defendant came forward as principal, and demanded the money for the goods. What did this convey to the plaintiffs? Plainly, the implication that Loisson had booked the goods with the defendant. And this implication—that the goods had been booked with the defendant—also attaches to R. & H. Adams, who sent the bill, as well as to the defendant, who authorized it to be so sent. The bill thus rendered was a direct assertion that the price was due to the defendant personally, and to no one else. That assertion surely involved, by fair implication, a corresponding obligation to deliver the property. It was as the maker of this assertion, with the corresponding obligation fairly implied, that the defendant accepted payment. This bill was issued and sent to the plaintiffs with the defendant's full and unqualified approval. It was not an isolated transaction, nor was it the result of mistake or inadvertence. It was part of a deliberately planned method of transacting business; and the bill followed the regular custom of that business. It will also be observed that the bill disclosed no principal other than the defendant. The plaintiffs were not told thereby that the defendant was acting as agent for the firms named therein. On the contrary, the bill was made out to the defendant personally,—that is, in terms it reads "To Andrew McLean, Dr." After this the vendee is informed that Andrew McLean is the sole agent,—not for the three firms, but for mosquito netting manufactured by the three firms. In other words, the vendee is informed of Mr. McLean's general line of business. The personal character of the bill, and of the contract impliable therefrom, is not varied by the notice stamped thereon, that the goods are shipped by one of the three firms. It was immaterial who was to ship them, or who then owned them or had them. The defendant agreed, for the price paid him, to deliver them; that is what the bill conveyed,—that, and nothing else. But, even if the plaintiffs had been informed that the bill was sent by R. & H. Adams, that would simply have been notice of that firm's avowal of the defendant's principalship, and disavowal of their own. It would

have been equivalent to their saying: "Loisson booked your order with us, but we have arranged to place it with Andrew McLean. Under our arrangements with him, however, we will deliver the goods to you upon your order. But it will be delivery upon his account, and he will look to you as his vendees for payment." And that idea the plaintiffs ratified by accepting the bill in McLean's name, and paying it accordingly.

The learned referee proceeded upon an erroneous view of the law when he suggested that if the plaintiffs did not know who the principals were, and had desired to be informed upon that subject, they could easily have obtained that information. The rule is the other way. It was held in Cobb v. Knapp, 71 N. Y. 348, that:

"It is not sufficient that the seller may have the means of ascertaining the name of the principal; he must have actual knowledge. There is no hardship in this rule of liability against agents. They always have it in their own power to relieve themselves, and, when they do not, it must be presumed that they intend to be liable."

The defendant's private arrangements with R. & H. Adams are quite unimportant. The one crucial fact is that when he authorized them to send out bills in his name, as principal, he permitted them to hold him out as such principal. The other crucial fact is that when, under that authority, R. & H. Adams sent out bills in the defendant's name, they disavowed their own principalship, and proclaimed his. And there is not a scintilla of evidence that the plaintiffs knew that the defendant was a mere collecting agent, nor is there a fact or circumstance in the case from which they could possibly have inferred any such agency. It would, indeed, have been an extraordinary and most unusual thing to constitute a man one's mere collecting agent, and yet to have all one's bills made out in that agent's name as principal. Everything in the case negatived any such inference. Thus, we find that this defendant acted throughout apparently as principal in this and in all other transactions. For instance, when he found that the plaintiffs had accidentally underpaid him by a few dollars, he telegraphed them at once in his individual name; and thereupon they sent him a check for the small balance, which he also retained. He seems also to have had entire control of the market, for he repeatedly sent out notices with regard to the prices of this particular commodity. The fact is that there was, as Mr. Swift understood, a combination of manufacturers of mosquito netting, composed of the three firms, and that this combination was represented by the defendant. The defendant acted apparently as supervisor or regulator of this combination. Its object, it may fairly be inferred from the proofs, was to avoid competition between the members thereof. One of the defendant's employés testified that all the goods billed in November, 1895, were, he thought, on the same terms. He could not explain how it happened that the terms of the three concerns were identical, but he believed that the goods were to be sold at the same price. The price of the commodity was fixed to equalize the charges of the three firms. It was undoubtedly to insure accuracy and good faith in this equal-

ization that all the bills were viséed by the defendant, and collected by him. He entered them upon a special ledger, received payment from the debtors, and paid over what he received (less 2 per cent., retained for "handling the accounts") to the proper member of the combination. When debtors were remiss in their payments, he "sent out regular monthly statements, such as are commonly sent out by mercantile houses." In the case under consideration, he paid over to R. & H. Adams what he received from the plaintiffs, less 2 per cent.; but that firm credited the plaintiffs only with what they so received from the defendant. Thus, R. & H. Adams failed to give the plaintiffs credit for the real price of the goods, and substantially charged them with the defendant's commission. This certainly looks like mere nominal bookkeeping. It points, at all events, to no contract between them and the plaintiffs to deliver the goods for the price specified in McLean's bill. The defendant, however, gave the plaintiffs credit upon his special ledger for the full price of the goods, just as he did upon a prior occasion, when his receipt specified that the check then given to him was in payment of his bill of June 6, 1895.

If this case depended solely upon the law of agency, the rules applicable thereto would not be questioned. No one doubts, for instance, that an agent who holds himself out as principal is liable as such. The agent is personally liable if he contracted in his own name, without disclosing his principal. Cobb v. Knapp, supra. Nor is the agent absolved by reason of the fact that he had no beneficial interest in the contract. It was held in Ferris v. Kilmer, 48 N. Y. 300, that one who authorizes another to use his name in the conducting and carrying on of a business is liable for the debts incurred in such business, although he has no beneficial interest therein. Even where the vendor or purchaser discloses the name of his principal, if he signs a written contract in his own name merely, which contract does not on its face show that he was acting as the agent of another, he will be personally bound thereby. Mills v. Hunt, 20 Wend. 434; Magee v. Atkinson, 2 Mees. & W. 440, was there cited with approval, the court saying that that was a case "where the broker had sent in a note of the sale to the purchaser in his own name," and that "it was held that evidence of a custom in Liverpool to send in brokers' notes without disclosing the name of the principal could not be received for the purpose of protecting the broker from liability." These cases differ from the present in the fact that there the agency was in the negotiations for the sale, while here it arose subsequently. They are not, therefore, literally in point, but the principle enunciated covers the peculiar divergence in the case at bar. But even if one, as matter of fact, is originally neither the actual principal nor the actual agent, he may make himself liable as principal by asserting his principalship, and contracting with regard thereto, upon a good consideration. Our conclusion upon the undisputed facts here is that the defendant, in consideration of the sum which he received from the plaintiffs, impliedly agreed to deliver to them the goods specified in the bill which he authorized to be rendered in his in-

dividual name. As between the plaintiffs and the defendant, the money in question was not paid to the latter, as the agent of R. & H. Adams, but was paid to the defendant personally, as demanded, pursuant to his authority. Upon that payment a corresponding obligation arose on the defendant's part to deliver the goods upon the plaintiffs' demand. The contract between these parties was thus completed, and that contract was entirely unaffected by the arrangement which Loisson had previously made with R. & H. Adams, of which the plaintiffs were in entire ignorance. And it would, as we have seen, have been entirely unaffected by that arrangement even though the plaintiffs had been notified that the bill which was rendered had emanated from R. & H. Adams.

There is nothing in the point that the proofs failed to substantiate the allegations of the plaintiffs' complaint. They did substantiate these allegations; that is, they established the essential facts. It would have been bad pleading to aver the evidence of those facts. Here the plaintiffs averred that they purchased from the defendant, and the defendant sold to them, the goods in question. They substantiated this averment when they proved an agreement on the defendant's part to deliver the goods to them in consideration of the purchase price. In legal intendment, that established a contract of sale.

The judgment should be reversed, and a new trial ordered before a new referee, to be appointed in the order entered hereon, with costs to appellants to abide event.

VAN BRUNT, P. J., and WILLIAMS, J., concur.

RUMSEY, J. (dissenting). The sole question in this case is one of fact. It is whether the goods which were sold by Loisson to the plaintiffs in November, 1895, were sold by the firm of R. & H. Adams, or were sold by the defendant, McLean. The plaintiffs alleged that they bought the goods of McLean, and paid for them, and he did not deliver them, and they asked damages of him for his failure to deliver them. He denied that the sale was made by him. This was the issue, and the plaintiffs were bound to prove by a preponderance of the evidence that the goods were bought of McLean, as they alleged. The referee having, upon conflicting evidence, found for the defendant, upon the ground that the goods were bought of R. & H. Adams, and not of the defendant, the presumption is that that finding is correct, and the question is whether there was sufficient evidence to warrant the referee in making that finding.

The facts are substantially not disputed. It appears from the testimony of Mr. Swift, one of the plaintiffs, that they were in business in Cleveland, Ohio; that they knew L. C. Loisson, and that he had been for several years a salesman for the firm of R. & H. Adams; and that they knew it, and they had no knowledge or reason to believe that he was employed for anybody else. As a matter of fact, it appears, and is not disputed in the case, that Loisson, during the month of November, 1895, and before that, was

a salesman for R. & H. Adams, and was not, and never had been, in the employ of McLean. In the prosecution of his business, Loisson wrote from Chicago to the plaintiffs, to Cleveland, proposing to sell them mosquito netting. That letter the plaintiffs did not produce. But in reply to it, on the 29th of October, they wrote to Loisson a letter which is printed as an exhibit, ordering the mosquito netting, the sale of which is the subject of this action. That order was sent by Loisson to R. & H. Adams, by whom he was employed, and was accepted by them, and the order was entered on their books. By the custom of business in the sale of mosquito netting, the bills are sent as of the 1st of April; and a discount is made from the amount of it of 6 per cent. if the bill is paid in 10 days, or 5 per cent. if the bill is paid in 30 days, and a further discount of 2 per cent. to the buyer for each month that elapses between the date of payment for the goods and the 1st of April. This custom of trade apparently was known to the plaintiffs, and they desired to take advantage of it. Up to this time the defendant, McLean, had not appeared at all in the transaction, and nothing was known of him by the plaintiffs, so far as has been made to appear. Indeed, at that time they seem to have been ignorant of his existence. If the transaction had stopped there, there can be no doubt that the only parties to it would have been the plaintiffs, on the one hand, and the firm of R. & H. Adams, as sellers, on the other. On the 1st day of November, however, the bill for those goods was sent to the plaintiffs, by the firm of R. & H. Adams. This is an undisputed fact in the case. The heading of the bill as sent was as follows: "William Taylor, Son & Company, to Andrew McLean, Dr." Then follow certain statements, which are not material here. The bill was for the amount of the goods sold pursuant to Loisson's order, by R. & H. Adams. Across the face of the bill was a statement: "These goods shipped by R. & H. Adams. All orders to be sent direct to 16 Greene St., New York;" and another statement, "Delivered by R. & H. Adams." A duplicate of the bill was sent to McLean, and the plaintiffs, shortly after having received it, sent to McLean the amount which, according to their figures, was the amount due on the bill, deducting the percentage and the discount for anticipation. McLean claimed that the discount was not correctly figured, and sent to the plaintiffs a telegram to that effect, signed by himself personally, asking for $26 more, which they remitted to him. These two checks were deposited by McLean to the credit of his company, but as was testified by several persons, and was not denied, were paid over to the firm of R. & H. Adams, after deducting his commissions for collection. It was proven in the case by several witnesses that McLean had a contract with the firm of R. & H. Adams and other firms engaged in the sale of mosquito nettings, by which he was to collect the bills for 2 per cent. commission, and remit the proceeds, less his commission, to the persons who sold the goods. This was not denied by anybody, and there is no reason to doubt its truth. It appears as an undisputed fact in the case that in the month of March the firm of R. & H. Adams failed.

Upon learning of it, Mr. Swift, one of the plaintiffs, immediately went to New York, and went to the place of business of R. & H. Adams, to make inquiries about these goods. From there he went to McLean, and had an interview with him, and after that this action was brought. What occurred in his interview with McLean has not been made to appear in the testimony. Mr. Swift does not claim that even at that time he advised McLean that he claimed to have purchased the goods of him, or that he made any demand upon him for them. This is substantially all the testimony bearing upon the question of the sale of these goods. Upon this testimony it is not apparent how the referee could have reached any different conclusion from the one he did reach.

When the bill was sent, the transaction was complete. The plaintiffs had dealt with the agent of R. & H. Adams, believing him to be such; had ordered the goods from him. The order had been remitted to his principals, and they had accepted it. That, clearly, made a contract between them and the Adamses. It is quite true that the bill was sent in the name of McLean, but this was done by the Adamses, and it was done for the purpose of enabling him to make the collections. If there had been no explanation of that fact, it would not have made him the seller of the goods which Adams had previously agreed to sell, and it was quite clear that he was not so regarded by the plaintiffs, because Mr. Swift says that, when he wanted a delivery of the goods after the failure of the Adamses, he went directly to their place of business to get it. There is not one word of testimony to contradict the statement that McLean was simply the agent to make these collections; nor is there anything to show that the plaintiffs believed or had reason to believe anything different. The evidence is overwhelming to sustain the referee in his findings of fact. The relation of McLean to this whole transaction is a natural one. It is undisputed. McLean was never relied upon by the plaintiffs as the seller of these goods. They did not, so far as appears, know of his existence until the bill was sent, and even then they did not look to him to deliver them.

But it is said that the contract with the Adamses was transferred to McLean, and assumed by him when the bill was sent in his name, and the money received by him. To this theory there are two insuperable objections. In the first place, no such claim was ever made by the plaintiffs either before the action was begun, or in the pleadings or upon the trial. It is rather a remarkable fact that the plaintiffs' witness Swift carefully forbore to say what claim he made to McLean when he visited New York to get the delivery of the goods from the Adamses; just as he carefully forbore to say what was contained in the letter which he, so fortunately for the plaintiffs, destroyed, and in which Loisson offered the goods to him. It certainly cannot be presumed, when he talked to McLean, that he asserted that McLean had become liable upon the contract, and the absence of any such assertion at any time is a very important piece of testimony, as contradicting the fact that such liability ever was deemed to have existed. It certainly could

not grow, as a matter of law, out of the relations between McLean and the Adamses; because the undisputed fact shows that that was only the relation of collector for pay, and that he paid to the Adamses the money he received from the plaintiffs. It could come to exist, if at all, only by virtue of an express contract between the plaintiffs and McLean, by which McLean assumed or became liable for the contract of the Adamses. But no evidence was given to establish such a contract. Neither is any such contract alleged in the complaint. The plaintiffs stand solely upon the assertion that McLean sold the goods to them as an original proposition, which is utterly false, and without one particle of evidence to sustain it.

Upon the evidence, and upon the pleadings, the referee could not find any differently from what he did, and the judgment entered upon his report should be affirmed.

PATTERSON, J., concurs.